Kal ISHMAEL v. Sally Rose ISMAIL

CA 98-896                                        989 S.W.2d 923

Court of Appeals of Arkansas
Division IV
Opinion delivered May 5, 1999

*Mike Everett*, for appellant.

*Saxton and Ayres*, by: *Clint Saxton*; and *Donald A. Forrest*, for appellee.

ANDREE LAYTON ROAF, Judge. Kal Ishmael appeals the provisions in a Crittenden County Chancery Court divorce decree that awarded his ex-wife Sally Rose Ismail a portion of her attorney fees and suit money and require that his visitation with his minor child be supervised. On appeal, Kal argues that the chancellor erred in 1) ordering him to pay Sally's attorney fees and in setting the amount so ordered; and 2) requiring supervised visitation. We affirm.

When Kal met Sally they were students at Memphis State University. Sally's studies there led to her becoming a Certified Public Accountant; Kal opted instead to attend various pilot training programs in pursuit of an apparently as yet unrealized career in aviation. Kal and Sally married on June 6, 1985, after Sally became pregnant with the parties' only child, Benjamin, who was born on January 20, 1986.

The parties separated in 1990, and Sally filed, then dismissed, a divorce action in Tennessee. Around this time, Kal, a native of Egypt, made to Sally the first of what was apparently repeated threats to take Benjamin out of the country and never let her see him again. Kal left Arkansas and moved to Port Huron, Michigan, where he lived and occasionally worked as a "financial advisor" for his brother-in-law, Dr. Khattab M. Joseph, a successful vascular surgeon.

The parties entered into marriage counseling with psychologist Dr. Walter R. Houston, a self-styled Christian family therapist. According to Dr. Houston, Kal initially denied, but later admitted, that he had threatened Sally with taking Benjamin out of the country and never letting her see him again.

Kal apparently continued to resist the dissolution of his marriage, and he initially acquiesced to the terms of a reconciliation agreement, dictated by Sally, that required of Kal that he not take Benjamin out of the country without prior authorization of the court; that he formally renounce his Egyptian citizenship; that he surrender his passport to Sally's attorney; and that he secure the agreement by a $50,000 cash bond deposited in the credit union managed by Sally's father and a pledge of the equity in the home owned by Dr. Joseph, which Sally believed to be approximately $50,000 to $60,000. Kal, however, never followed through on the reconciliation agreement, and the parties never again cohabitated.

According to Sally, on the advice of her attorney, who told her that she would get a "better deal" in Arkansas, she petitioned for divorce in Crittenden County, on May 26, 1992. In her complaint, she alleged that Kal threatened to take Benjamin out of the country and never allow her to see the child again. In addition to seeking full custody, the petition prayed that Kal's visitation be restricted and that a mutual restraining order be granted that would enjoin the parties from "bothering or harassing the other and/or removing the parties' children [sic] from the jurisdiction." On May 27, 1992, Sally caused to have entered an ex parte order restricting Kal's visitation so as to allow it to be exercised only in her presence. The order also granted her temporary use and possession of the marital residence. On October 6, 1992, a mutual restraining order was entered that enjoined the parties from "disposing of any assets owned by the parties without prior Court approval and more particularly to the withdrawal of any funds from any bank account that either party may have . . . in amounts over $1,000 without prior Court approval."

Sally then undertook a determined effort to find and lay claim to some or all of the money that Kal handled for Dr. Joseph. To this end, she hired as many as five private investigators in Michigan and Florida, who located several bank accounts into which Kal had deposited hundreds of thousands of dollars of Dr. Joseph's money. In preparation for the divorce proceedings, Sally had her legal team depose several bank employees in Michigan

who had knowledge of Kal's transactions. These accounts were held in names other than Kal Ishmael and under social security numbers that were different from his. Kal admitted that he worked these deceptions to keep Sally from getting her hands on the money.

After a two-day hearing in September of 1996, in which the out-of-state witnesses testified by deposition, the chancellor took the matter under advisement. On February 11, 1998, a decree was finally filed for record. It dissolved the marriage on the grounds of general indignities; granted Sally full custody of Benjamin; awarded Sally use and possession of the marital home until Benjamin reaches the age of eighteen or graduates from high school; awarded the parties the automobiles and personal property then in their possession; made an equitable distribution of the parties' bank account; continued the supervised visitation established in the 1992 *ex parte* temporary visitation order based on a finding that unsupervised visitation with Kal posed an abduction risk; established child support at $75 per month based on a finding that Kal was unemployed; and awarded Sally $15,000 in attorney fees, $2,500 in suit money, and $58.75 in costs. The award of attorney fees represented approximately half of what Sally claimed to have expended in her case. The suit money reflected the amount of an expert witness fee charged by Philip Schwartz, an attorney who specializes in international matrimonial law. Schwartz had testified by deposition that if Kal abducted Benjamin and fled to Egypt, it would be difficult and costly, if not impossible, for Sally to get him back. The chancellor also made a specific finding that Kal did not own any of the funds contained in the Michigan bank accounts that he had opened and declined to find him in contempt for removing these funds from the accounts that he had opened.

Kal first argues that the chancellor erred in ordering him to pay Sally's attorney's fees and suit money, and in fixing the amount thereof. Citing *Paulson v. Paulson*, 8 Ark. App. 306, 652 S.W.2d 46 (1983), and *Anderson v. Anderson*, 60 Ark. App. 221, 963 S.W.2d 604 (1998), for the proposition that a chancellor must consider the financial means of the parties in his decision to award

attorney fees, he asserts that the $17,558.75 in attorney fees and costs that he was ordered to pay is more than his net worth and more than twice his annual income. Further, he recites that during the pendency of the divorce, the most money that he ever made in a year was in 1992, when he made $16,088, while in comparison, Sally's salary at the time of the hearing was $36,586. Kal also notes that the property settlement from the marriage left him with a 1985 Toyota; half-interest in the equity in the $85,000 marital residence, which he could not realize until after Benjamin turns eighteen; a judgment for $3,500; and $136,000 in debts. Furthermore, Kal contends that "an enormous majority" of Sally's legal fees were incurred in a futile effort to discover marital property, an issue that she lost on. Kal acknowledges that the standard of review for the award of fees is daunting, but contends that the award of fees in this case should be reversed because it was clearly erroneous. We disagree.

A chancellor has considerable discretion to award attorney's fees in a divorce case. *Gavin v. Gavin*, 319 Ark. 270, 890 S.W.2d 592 (1995). In determining whether to award attorney's fees, the chancellor must consider the relative financial abilities of the parties. *Anderson v. Anderson, supra; Paulson v. Paulson, supra; see also Lee v. Lee*, 12 Ark. App. 226, 674 S.W.2d 505 (1984). In setting the amount of fees awarded, it is well settled that the chancellor is in a better position to evaluate counsel's services than an appellate court, and, in the absence of clear abuse, the chancellor's award of an attorney's fee will not be disturbed on appeal. *Wilson v. Wilson*, 294 Ark. 194, 741 S.W.2d 640 (1987).

Here we find no abuse of discretion. Although Kal apparently had no present employment, he testified that he had secured his commercial pilot's license at a cost of more than $100,000. Furthermore, Kal's purported lack of funds was no deterrent to his flying to Europe and the Middle East with a regularity that made him unable to recall with specificity an overnight stay in London only few months before. Moreover, although the amount of the attorney's fees awarded in this case is considerable, we note that it was less than the total fees incurred by Sally. Furthermore, while Sally's attempt to lay claim to the several thou-

sand dollars that Kal controlled ultimately proved unsuccessful, the circumstances created by her much-traveled estranged husband nonetheless could reasonably have been considered by the chancellor in making his fee award. *See Grant v. Grant*, 254 Ark. 1060, 497 S.W.2d 255 (1973)(upholding a large attorney fee award where the appellee had expended a significant sum of money to hire private investigators to help prove the appellant had committed adultery on his many business trips).

For his second point, Kal argues that the chancellor "became incensed" at what he perceived to be Kal's dishonesty as evidenced by the fact that the chancellor "unreasonably chastised" him about his testimony. He contends that in so doing, the chancellor lost sight of the best interest of the child, the "polestar" for making judicial determinations concerning custody and visitation matters. He argues that while he was purported to have first threatened to abduct Benjamin in 1987, he has had the child alone many times since then and never acted upon these alleged threats. He also denies ever having made such a threat. He urges this court to find him credible, where the chancellor did not, and believe him when he testified "reasonably" that he would not remove Benjamin from America because it would ruin his and his son's life and that supervised visitations were detrimental to his relationship with his son. Finally, Kal asserts that the chancellor ignored Sally's lack of credibility as established by the fact that she testified that he controlled all the family money yet he proved that she signed ninety-four percent of some 1,480 checks. This argument fails to persuade.

The governing principle for making judicial determinations concerning custody and visitation is the best interest of the child. *Marler v. Binkley*, 29 Ark. App. 73, 776 S.W.2d 839 (1989). While chancery cases are tried *de novo* on appeal, the chancellor's decision will not be reversed unless it is shown that his decision is clearly against the preponderance of the evidence. *Id.* Because there are no cases in which the superior position, ability, and opportunity of the chancellor to observe the parties and their witnesses carry as great a weight as one involving the

custody of children, this court defers to the chancellor's determination as to the credibility of the witnesses. *Id.*

This court cannot revisit a finding concerning a witness's credibility on appeal, so even if the order of supervised visitation turned solely on the fact that the chancellor believed Sally when she said that Kal threatened to take Benjamin out of the country and did not believe him when he denied it, we would have to affirm the chancellor. There is, however, more in the record to uphold the chancellor's ruling on this issue. Specifically, Dr. Houston testified that, in the course of his providing counseling to Kal and Sally, Kal admitted threatening Sally with Benjamin's abduction.

Here, preventing Kal from abducting Benjamin was obviously an important consideration for the trial court in establishing and maintaining supervised visitation; indeed, Kal himself testified that removing Benjamin from America would ruin the child's life. Accordingly, we find that it is simply disingenuous to assert that the chancellor failed to consider the best interest of the child in ordering supervised visitation. We are not unmindful of the fact that Kal failed to act on his threat despite ample opportunity to do so, over a period of several years. However, during this time he was actively seeking reconciliation with Sally, an eventuality that is obviously foreclosed to him now. Deferring as we must to the superior position of the chancellor to determine the credibility of the witnesses, we are unable to conclude that the chancellor erred when he ordered that Kal's visitation with Benjamin continue to be supervised. *See Lowell v. Lowell*, 55 Ark. App. 211, 934 S.W.2d 540 (1996).

Affirmed.

PITTMAN and HART, JJ., agree.