Judy WEATHERLY  *v.*  James WEATHERLY

CA 03-897                                          190 S.W.3d 274

Court of Appeals of Arkansas
Division III
Opinion delivered September 8, 2004

*Gregory E. Bryant*, for appellant.

*Deborah Pipkins*, for appellee.

JOSEPHINE LINKER HART, Judge. In this appeal, appellant Judy Weatherly questions the division of both marital and nonmarital property and debts in a divorce decree. Specifically, she challenges the trial court's award of a ring to appellee, the court's offset of improvements to appellant's nonmarital property against marital property, and the court's refusal to divide her medical bills between the parties. We reverse and remand the court's award of the ring and affirm in all other respects.

Appellant and appellee James Weatherly were married on October 24, 1998, and separated on October 27, 2001. Appellant filed for a divorce and sought a division of the personal property and debts accumulated during the marriage. In response, appellee admitted that there were personal property rights and debt obligations to be adjudicated. He also argued entitlement to a benefit based on the expenditure of marital funds that were spent on the residence appellant owned prior to the marriage.

At trial, appellant testified that, before the marriage, appellee purchased a wedding ring. She stated that she and appellee went to

the jewelry store, and while she may have gone into the store with him, she waited outside while appellee discussed the purchase of the ring with the store owner. When appellee came out of the store, he placed the ring on her finger. She told him she could not accept it because she was not expecting it. He then said it was a friendship ring, though he later told other people that it was an engagement ring. She testified: "[W]e joked about it, that if we got married that I could keep it." Appellant testified that there was an oral agreement, made shortly after she was given the ring, that it would go to appellee's daughter Jamie Blankenship upon appellant's death but that she was never told that the ring was to be Jamie's. She noted that the ring was sized for her hand and was too small for Jamie. She also asserted that she had not taken the ring off from the time he gave it to her except to add a ring guard. According to appellant, the parties never discussed what would happen with the ring if they divorced. Appellant admitted telling Jamie that she would devise the ring to her.

Appellant also testified that she made payments with marital funds on furniture purchased both before and after the marriage. She stated that the parties lived in her residence during the marriage, with mortgage payments being made from her separate account. She also stated that appellee was in the logging business and purchased a skidder during the marriage for $20,000, along with various tools and equipment valued at $800. She further asserted that, prior to the marriage, she purchased a lawn mower valued at $2,800 and a tiller valued at $670. Other lawn equipment was purchased during the marriage.

Appellant also said that appellee purchased with the proceeds from an accident settlement a 2000 Toyota truck costing approximately $30,000. She stated that in 1999 she paid off her truck with marital funds. She asserted that, during the marriage, they had separate checking accounts and savings accounts, as well as several joint accounts. She admitted that marital funds were used to make payments on an addition to her house. Appellant also stated that appellee owned real property prior to the marriage, that the property was continuously rented for $500 to $600 or $650 a month during the marriage, and that he put the rental income into either a joint account or his logging business account.

Appellant also testified that she had been hospitalized and had undergone surgeries during the marriage because of her "nerves." She admitted that she had some "nerve" problems prior

to the marriage. She stated that she owes one of the hospitals $11,000 and has over $22,000 in other medical bills.

Richard Masters, the owner of the jewelry store, testified that, after appellee saw the ring mounting in the store, appellee told him that each of his girls had a ring that belonged to his first wife and that he wanted to do something for Jamie. Masters stated that appellee paid a total of about $5,000. He stated that it was worth approximately $8,500 but that the retail price would be more than that. He also stated that appellee was alone when he purchased the ring. While Masters remembered measuring appellant's finger, he did not know if she had the ring on in the store. Masters asked appellee if it was to be an engagement ring, and he stated that it was Jamie's ring. Masters also testified that he made a wedding band for that ring.

Jamie Blankenship testified that appellant offered to devise the ring to her. She told appellant that she did not want to get into the middle of a dispute and that it was not her place to comment on the matter. Jamie also testified that she spoke about the ring with appellee and appellant after they married. They told her that the ring was to be hers. She also said that they did not say that she would get the ring after appellant's death but only that it was hers and she was to get it.

While testifying about the parties' property, appellee said that appellant wrote checks out of their joint account. He also confirmed appellant's testimony about the skidder, but he added that he only has a one-half interest in it. He valued the skidder at $5,000, even though he paid $20,000 for it. Appellee testified that he wrecked the 2000 Toyota truck and that the parties paid for appellant's vehicle during the marriage. The parties, he said, made improvements to appellant's pre-marital residence, including in-stalling water meters costing $975, pipe lines costing $2,000, a septic tank costing $1,000, and repairing two house trailers and a small office. Appellant also put an addition on her residence, but he did not help her with the cost of the addition. He also testified that a floor, a sink, and cabinets were placed in one of appellant's house trailers for about $500, and "vinyl rugs" were placed in the house trailers at a cost of $1,000. He also admitted renting his property, making at least a $200 monthly profit. He offered no testimony concerning his intentions about the ring.

The trial court ruled that appellant had a life estate in the ring, which the court valued at $1,105.14, and ordered appellee to pay that amount to appellant. Appellant was ordered to return the

ring to appellee. The trial court also ordered the furniture sold, with appellant to receive the first 26% of the proceeds as compensation for money she paid for the property prior to the marriage and the remaining 74% to be divided equally between the parties. The trial court found that appellee had spent $11,525 to improve appellant's nonmarital real property. In exchange for that interest, appellee was allowed to keep his tools, a table saw, his choice of one sewing machine and one range, and the skidder, as well as his clothes, a television, and a hair dryer at appellee's residence. Appellant was awarded the other sewing machine, a range, and lawn equipment. Appellee's rental property was found to be his separate property and was awarded to him. The trial court stated that an unequal division of the marital property was being made in appellant's favor. A decree memorializing these findings was entered on May 5, 2003. This appeal timely followed.

■■ The supreme court has recently discussed the standard of review for the division of property in a divorce case:

> On appeal, chancery cases, such as divorces, are reviewed *de novo*. With respect to the division of property in a divorce case, we review the chancellor's findings of fact and affirm them unless they are clearly erroneous, or against the preponderance of the evidence; the division of property itself is also reviewed, and the same standard applies. A finding is clearly erroneous when the reviewing court, on the entire evidence, is left with the definite and firm conviction that a mistake has been committed. In order to demonstrate that the chancellor's ruling was erroneous, an appellant must show that the trial court abused its discretion by making a decision that was arbitrary or groundless. We give due deference to the chancellor's superior position to determine the credibility of witnesses and the weight to be given their testimony.

*Gray v. Gray*, 352 Ark. 443, 453-54, 101 S.W.3d 816, 821 (2003) (citation omitted).

Appellant first argues that the trial court erred in returning the ring to appellee. The trial court held that appellee made a gift of the ring to appellant. It is clear that appellee made some sort of gift to appellant and that appellee thereby divested himself of any interest in the ring. Therefore, we agree that the trial court erred in awarding the ring to appellee. We recognize that the interest that third parties may have in the ring remains unresolved. Given, however, that such parties have not been joined in the present

case, the existence and extent of any such interests cannot be resolved in the present proceeding.

As her second point, appellant argues that the trial court erred in giving appellee credit against other marital property for money spent on her separate property. Citing *Box v. Box*, 312 Ark. 550, 851 S.W.2d 437 (1993), she argues that, because the money he spent on her pre-marital house did not increase the value of house, the court erred in offsetting the amount of the improvements against other marital property. *Box*, however, actually supports the court's decision.

The increase in value of property acquired prior to marriage is not marital property. Ark. Code Ann. § 9-12-315(b)(5) (Repl. 2002). The statute, however, further allows a trial court the flexibility to distribute both marital and nonmarital property in order to make an equitable division of marital property. Ark. Code Ann. § 9-12-315(a)(2); *Copeland v. Copeland*, 84 Ark. App. 303, 139 S.W.3d 145 (2003); *Creson v. Creson*, 53 Ark. App. 41, 917 S.W.2d 553 (1996). Here, the trial court found that the appellee was entitled to some benefit by reason of marital funds having been used to improve the appellant's property. That benefit came when the trial judge awarded appellee almost all of the marital property after the furniture was sold. *See Box, supra; Williford v. Williford*, 280 Ark. 71, 655 S.W.2d 398 (1983); *Camp v. Camp*, 18 Ark. App. 87, 710 S.W.2d 842 (1986). Given the evidence presented at trial, we cannot say that he erred.

For her third point, appellant asserts that the trial court erred in not dividing the medical bills she incurred during the marriage. Appellant asserts that, to make an equal division of the assets, the liabilities must also be equally divided. In essence, she argues that, because marital *property* must be divided equally unless the court finds that such a division is inequitable, *see* Ark. Code Ann. § 9-12-315 (Repl. 2002), it also requires that the division of *debts* be treated the same way. This court, however, has held that the statute does not apply to the division of marital debts and that there is no presumption that an equal division of debts must occur. *Williams v. Williams*, 82 Ark. App. 294, 108 S.W.3d 629 (2003); *Ellis v. Ellis*, 75 Ark. App. 173, 57 S.W.3d 220 (2001).

Appellant testified that she owed $11,000 to one hospital and over $22,000 in other, unspecified medical bills. But, she also testified that she had these same problems before the

marriage, but neither her testimony nor any medical bills were introduced to indicate which bills were incurred after the parties married. It was appellant's burden to produce sufficient evidence to enable the trial court to divide the medical bills, and she failed to meet that burden. *Wilson v. Wilson*, 294 Ark. 194, 741 S.W.2d 640 (1987). Thus, we cannot say that this finding is clearly erroneous. We affirm on this point.

Affirmed in part; reversed in part.

PITTMAN and ROBBINS, JJ., agree.