Jacqueline Kight WILSON *v.* John Lofton WILSON

86-296                                     741 S.W.2d 640

Supreme Court of Arkansas
Opinion delivered December 21, 1987
[Rehearing denied February 1, 1988.*]

---

*Holt, C.J., and Newbern, J., not participating.

196

*Eichenbaum, Scott, Miller, Crockett, Liles & Heister, P.A.,* by: *C. Richard Crockett,* for appellant.

*Dodds, Kidd, Ryan & Moore,* by: *J.L. Kidd,* for appellee.

ALEX G. STREETT, Special Justice. This is a divorce case which involves an interpretation of Ark. Stat. Ann. § 34-1214 (Supp. 1985) and our jurisdiction arises from Arkansas Supreme

Court and Court of Appeals Rule 29(1)(c). The appellant raises five points for reversal.

Appellant, Jacqueline Kight Wilson, and appellee, Dr. John Lofton Wilson, were married on the 16th day of June, 1962. They lived together as husband and wife from that date until approximately April 1980. Appellant claimed the separation was because of appellee's admitted infidelity, and appellee, though admitting the infidelity, asserted other reasons. Appellee began medical school in 1960, and was therefore in attendance at medical school at the inception of the parties' marriage. Upon graduation, appellee did a one-year internship and then completed a four-year residency in 1969, obtaining a specialization in orthopedic surgery. Appellee undertook the full-time practice of an orthopedic surgeon in July 1969, when he was hired by Orthopedic Associates, Inc., where his employment has been continuous.

Appellant was employed a majority of the time during appellee's pursuance of a medical education and contributed income to the marriage. In addition, appellant contributed to the marital estate in the approximate amount of $121,000.00, which was money she had received by inheritance or advancement, and which was commingled with the parties' marital assets.

The court granted appellant a divorce on her counterclaim on June 24, 1983, and reserved jurisdiction with respect to the division of property, alimony, child support and attorney's fees. At the same time, the court ordered appellee to pay temporary alimony and child support in the amount of $3,649.00 per month. On July 20, 1984, this monthly amount was reduced by $1,145.00, which reduction represented a monthly payment made towards the satisfaction of a promissory note. Finally, the temporary alimony was reduced to $1,526.00 per month, and child support was fixed at $600.00 per month, effective September 1, 1984. The alimony was discontinued entirely in June of 1986, but child support was continued at $500.00 per month. At the final hearing, the court fixed the value of appellee's stock in Orthopedic Associates, Inc., at $20,000.00, and awarded appellant $10,000.00 as her one-half interest. The court also awarded $7,500.00 in attorney's fees to appellant's attorney, to be paid by appellee.

We will discuss appellant's points in reverse order.

## 1. THE COURT ERRED IN ITS AWARD OF ATTORNEY'S FEES.

Appellant's attorneys submitted affidavits to the trial court, showing attorney's fees incurred of $34,028.10, and expenses of $3,502.27. The court awarded appellant's attorneys a fee of $7,500.00. The trial court has considerable discretion in the allowance of attorney's fees in a divorce case. *Richardson* v. *Richardson*, 280 Ark. 498, 659 S.W.2d 510 (1983). *Ford* v. *Ford*, 272 Ark. 506, 616 S.W.2d 3 (1981). The chancellor is in a better position to evaluate the services of counsel than an appellate court, and, in the absence of clear abuse, the chancellor's fixing of an attorney's fee will not be disturbed on appeal. *Id.* at 518, 616 S.W.2d at 9; *Wiles* v. *Wiles*, 246 Ark. 289, 437 S.W.2d 792 (1969).

Unless the chancellor finds it to be equitable, there is no compelling reason for the husband to automatically pay the wife's attorney's fees. *Meinholz* v. *Meinholz*, 283 Ark. 509, 678 S.W.2d 348 (1984). We cannot say the chancellor abused his discretion in awarding a fee of $7,500.00. We do, however, award appellant an additional $2,500.00 as attorney's fees for services in this court.

## 2. THE COURT ERRED IN NOT AWARDING ALIMONY TO APPELLANT.

From the time of the parties' separation, in April 1980, until their divorce decree and support order of June 24, 1980, appellee paid the appellant $195,271.00, plus payments on notes and taxes in the amount of $153,000.00. The June 24th decree ordered appellee to pay $3,649.00 per month in temporary alimony and support, which eventually was reduced on two occasions, the last of which established monthly alimony payments at $1,526.00, and support payments at $600.00, effective September 1, 1984. In addition to this alimony and support, appellant received rental income in the amount of $275.00 per month and income from non-marital property in the approximate sum, including interest, of $1,000.00 per year. In considering appellant's entitlement to alimony, the trial court also considered a number of other property interests of the parties, as well as appellant's age, forty-

five years, and the fact that she was a licensed medical technician. During the pendency of this action, the trial court, without success, encouraged appellant to seek employment. The trial court terminated alimony payments effective after July 1986.

The award of alimony in a divorce action is not mandatory but is a question which addresses itself to the sound discretion of the chancellor. Unless the chancellor clearly abuses that discretion, we do not reverse. *See Neal* v. *Neal*, 258 Ark. 338, 524 S.W.2d 460 (1975), and *Stout* v. *Stout*, 4 Ark. App. 266, 630 S.W.2d 53 (1982). Here, the chancellor, in his orders and decrees, went into detail concerning the parties' particular circumstances. We cannot say the chancellor abused his discretion in discontinuing alimony.

3. THE TRIAL COURT ERRED IN NOT CONSIDERING THE BALANCE OF THE PROFIT SHARING AND PENSION PLANS AS OF JUNE 30, 1983, AS MARITAL PROPERTY, AS WELL AS ANY CONTRIBUTIONS MADE TO THE PLANS FOR THE BENEFIT OF THE APPELLEE AFTER THE DIVORCE.

The parties were divorced on June 25, 1983. Increases in profit sharing and pension plans were credited to appellee's account on June 30, 1983, five days after the decree of divorce was entered. Ark. Stat. Ann. § 34-1214(a)(1) (Supp. 1985) clearly provides the marital property should be distributed at the time of the divorce. Accordingly, it is not an abuse of the chancellor's discretion to ascertain the extent of the marital property as of the date of the divorce, and evaluate it as of that date, as well. *Askins* v. *Askins*, 288 Ark. 333, 704 S.W.2d 632 (1986). Although appellee was one hundred percent vested as to contributions already distributed to his pension and profit sharing account when the parties divorced, further contributions were contingent upon his continued employment. *Accord Day* v. *Day*, 281 Ark. 261, 663 S.W.2d 719 (1984) (wherein the court upheld the trial court's decision applying all the husband's contributions made to the plan after the divorce to his benefit only). We also note that there is no showing that the appellee had in any way defrauded appellant by holding back any contributions made to his account until after the divorce. To the contrary, the evidence reflects that it was standard procedure for the corporation to add

to the plans at the end of the fiscal year which was June 30th. On these facts, we believe the chancellor was correct in deciding those contributions were not marital property when made to appellee's profit sharing and pension plans after the date of the divorce.

4. THE COURT ERRED IN NOT HOLDING THAT THE BONUS AWARDED APPELLEE FOR THE YEAR ENDING JUNE 30, 1983, TO BE MARITAL PROPERTY.

The situation in the previous point is similar to the one here, except that we now must consider a bonus given appellee on June 30, 1983, again five days after the date of the divorce. In contrast to the contributions made to appellee's pension and profit sharing plans, the record reflects the appellee had acquired an accrued or fixed interest in the bonus which, appellee concedes, was based on the amount of work he produced. In fact, appellee's employment agreement with Orthopedic Associates, Inc. *required* the company to pay appellee an incentive bonus based on his productivity and the profitability of the company. Clearly, appellee's bonus was an award for services rendered in the past and only the exact amount was left for determination at the end of the corporation's fiscal period. Appellee possessed an enforceable right to the bonus and Orthopedic Associates, Inc. could not unilaterally deprive appellee of it by terminating the employment relationship. *Day*, 281 Ark. at 267, 663 S.W.2d at 721, 722. Because most of appellee's bonus accrued and, therefore, was acquired during his marriage to appellant, we hold the chancellor abused his discretion in finding that none of the bonus was marital property. Therefore, we reverse and remand this cause on this point.

5. THE COURT ERRED IN NOT TREATING (A) APPELLEE'S MEDICAL DEGREE, LICENSE, OR IN- CREASED EARNING CAPACITY AS MARITAL PROP- ERTY (B) HIS MEDICAL PRACTICE, INCLUDING GOODWILL, AS MARITAL PROPERTY, OR (C) ALTER- NATIVELY, IN NOT CONSIDERING THE VALUE OF GOODWILL IN VALUING THE STOCK (APPELLEE'S INTEREST) IN ORTHOPEDIC ASSOCIATES, INC.

In *Meinholz* v. *Meinholz*, 283 Ark. 509, 678 S.W.2d 348 this court affirmed the chancellor's decision that the hus-

band's "enhanced business career" was not marital property. In doing so, the court discussed the case of *Inman* v. *Inman*, 578 S.W.2d 266 (Ky. Ct. App. 1979), which set out the test or factors that had to be met before a spouse's increased earning power, represented by a professional degree or license, could be counted as marital property.[1] The test was three-fold: (1) there was no accumulated marital property; (2) the spouse who subsidized the degree is ineligible for maintenance; and (3) the court had to consider the extent to which the non-license holder had already or otherwise benefitted financially from his or her spouse's earning capacity. In applying that test to the facts in *Meinholz*, we found that Mrs. Meinholz had been married to her husband for eighteen years, and had already reaped benefits from his increased earning capacity. Also, Mrs. Meinholz was eligible for maintenance, which, in fact, had been ordered by the trial court.

Even if we were willing and ready to declare that a professional license or degree should be treated as marital property, the circumstances here simply do not meet the test or factors noted in *Meinholz*. The record reflects a marriage of eighteen years and considerable accumulated marital property, which has been divided, including a residence on several acres, two other farms, automobiles, cattle, horses and equipment. Appellant also was awarded an interest in the appellee's pension and profit sharing plan, and still has other property interests to be determined and awarded.

Concerning her eligibility for maintenance, appellant already has received substantial alimony. For over three years, appellee voluntarily gave $6,000.00 per month maintenance and support for the appellant and the children. As previously discussed, the alimony awarded appellant continued in a reduced form until July 1986. In sum, appellant had received maintenance and support payments for a six-year period.

Finally, in determining whether appellant has already benefitted financially from her spouse's earning capacity, we note again that the parties had been married for eighteen years, and

---

[1] Mrs. Meinholz analogized her situation to the professional license cases even though her husband had no degree or license. In disposing of her argument, this court referred to the test in *Inman* v. *Inman*.

during that time, she had household help three days a week and a handyman to do yard work and minor repairs. For several years she was able to engage in the hobby of raising, breeding and showing horses. Appellant was also provided automobiles, the last two being Cadillacs. This case, as was the situation in *Meinholz*, cannot be analogized to the typical professional license case, where the divorce occurs at the point where the increased earnings begin. Therefore, in considering and applying the test set out in *Meinholz*, the chancellor here was unerringly correct in not treating appellee's medical degree, license or increased earnings capacity as marital property.

Appellant's remaining two points for reversal will be considered jointly, since they are so closely intertwined. As restated, the appellant contends that the lower court erred in not treating appellee's medical practice, including goodwill, as marital property, or alternatively, in not considering the value of goodwill when determining the value of appellee's interest in Orthopedic Associates, Inc.

The appellee was a stockholder, president and director of Orthopedic Associates, Inc. He was one of three stockholders and owned one-third of the stock. Orthopedic Associates, Inc. had an equity of $96,038.93, plus receivables ranging from $200,000.00 to $350,000.00. James McAnally, who was employed by Orthopedic Associates, P.A. since 1981, and who also held the job of office manager of Orthopedic Associates, Inc., testified that the receivables of the corporation were somewhere between $250,000.00 and $350,000.00. The corporation had an average write-off to loss of about ten percent, but its actual gross collection rate was only around eighty-five percent, which gave the company a fifteen percent total loss. The appellee testified that the accounts receivable ranged from $200,000.00 to $300,000.00.

Dr. Rawleigh Ralls, president of Educational Research Associates, Inc., was qualified as an expert regarding economics, finance and statistics. He testified, over appellee's objection, as to the fair market value of appellee's practice. Appellant's attorney correctly pointed out that the value of appellee's practice, or the estimated value of his stock in Orthopedic Associates, Inc., was one of the issues before the court. Dr. Ralls testified that the value of appellee's practice at that time was $716,954.91. In arriving at

this figure, Dr. Ralls considered appellee's earning history for the past ten years, and converted the past earnings into 1986 dollars, so that Ralls could assess the past income figures in terms of equivalent income today that would have the identical purchasing power. Ralls added appellee's ten years' earnings, divided by ten, and obtained an average value of $238,948.97; he then used a multiple of three times appellee's average minimum earnings, which yielded a value of $716,954.91. Dr. Ralls testified that three times the earnings is one of the rules of thumb that is used by practice management consultants to value medical practices or specialty medical practices. Dr. Ralls candidly admitted that he had mistakenly included appellant's earnings in arriving at the value of appellee's practice, but he denied the error made any material difference in his figures.

Appellee failed to introduce any value of the corporate stock or his equity in Orthopedic Associates, P.A., except that which was reflected in one of the parties' joint exhibits. The parties, in that exhibit, stipulated appellee's equity ownership to be $20,000.00, exclusive of his interest in the company's pension and profit sharing plan; this stipulation was made in August 1983. It was, however, followed by other, but conflicting, joint exhibits. Those later exhibits, introduced at trial, contained stipulations listing all controverted and non-controverted marital property, and, in doing so, listed both the Orthopedic Associates, P.A. and appellee's medical practice as controverted items. Conversely, neither of these items were listed as non-controverted items on those joint exhibits. Because these later exhibits reflect the parties' stipulation and understanding at the time of the trial, we believe they clearly were controlling.

Although some difference exists over what the parties had agreed upon at trial, appellee obviously relied on the company's stock purchase agreement, which was executed on February 2, 1982, between him, Orthopedic Associates, Inc. and the company's other principals. As can be readily discerned, appellee executed the agreement about sixteen months after the parties filed for divorce. That agreement provided that if the stockholder terminated his employment, he then was required to sell, and the corporation was required to buy, all of his stock for $20,000.00. The agreement further provided that while a stockholder is employed by the corporation, before any stock owned by him may

be sold to a third party, the stock must first be offered to the corporation for a redemption at the same price and upon the same terms offered by a bona fide prospective purchaser of such shares.

After our careful study of the evidence bearing on the value of appellee's interest in Orthopedic Associates, Inc., we can only conclude that appellee's stock was worth more than the $20,000.00 provided in the company's stock purchase agreement and that the chancellor erred in valuing the stock in that amount.

■ While we conclude that the evidence clearly reflects that appellee's stock exceeds a value of $20,000.00, we also find that there is insufficient evidence in the record to place a value on that stock. First, we note the chancellor expressed some doubts regarding Dr. Rall's value testimony, but, aside from those doubts, he apparently gave little consideration to that testimony since the chancellor merely accepted the $20,000.00 value set out in the stock purchase agreement and the parties' first stipulation. Second, while appellant offered value testimony concerning appellee's medical practice, appellee offered none because he relied entirely on the parties' earlier stipulation and the $20,000.00 figure in the stock purchase agreement. Of course, in this appeal, we have held the chancellor erred in relying on that $20,000.00 amount. In view of these circumstances, we believe fairness requires our remand of this cause to permit both parties to fully develop their value testimony regarding the appellant's marital interest in the corporate stock.

Finally, we turn to appellant's argument concerning professional goodwill, and whether goodwill should be treated as marital property. The prevailing view appears to be that goodwill of a professional practice or business is a business asset with a determinable value and is marital property, subject to division in a divorce proceeding. *Wisner* v. *Wisner*, 129 Ariz. 333, 631 P.2d 115 (Ct. App. 1981); *In re Foster*, 42 Cal. App. 3d 577, 117 Cal. Rptr. 49 (1974); *In re Marriage of Nichols*, 606 P.2d 1314 (Colo. Ct. App. 1979); *In re Marriage of White*, 98 Ill. App. 3d 380, 424 N.E.2d 421 (1981); *Heller* v. *Heller*, 672 S.W.2d 945 (Ky. Ct. App. 1984); *In re Marriage of Hull*, 712 P.2d 1317 (Mont. 1986); *Dugan* v. *Dugan*, 92 N.J. 423, 457 A.2d 1 (1983); *Hurley* v. *Hurley*, 94 N.M. 641, 615 P.2d 256 (1980); *Weaver* v. *Weaver*, 72 N.C. App. 409, 324 S.E.2d 915 (1985); *In re Marriage of*

*Fleege*, 91 Wash.2d 324, 588 P.2d 1136 (1979). Some jurisdictions, however, have held that professional goodwill does not constitute property and should not be considered as marital property divisible in such proceedings. *See Powell* v. *Powell*, 231 Kan. 456, 648 P.2d 218 (1982); *Nail* v. *Nail*, 486 S.W.2d 761 (Tex. 1972); *Holbrook* v. *Holbrook*, 103 Wis. App. 327, 309 N.W.2d 343 (1981).

Recently, the Nebraska Supreme Court made a thorough analysis of when goodwill is an asset and is marital property subject to division in a divorce action. *See Taylor* v. *Taylor*, 222 Neb. 721, 386 N.W.2d 851 (1986). The court in *Taylor* pointed to the difficulty that arises in valuing a professional practice when goodwill is likely to depend on the professional reputation and continuing presence of a particular individual in that practice. *Id.* at 729, 386 N.W.2d at 857. In a further discussion of that point, the court said:

> [W]here goodwill is a marketable business asset distinct from the personal reputation of a particular individual, as is usually the case with many commercial enterprises, that goodwill has an immediately discernible value as an asset of the business and may be identified as an amount reflected in a sale or transfer of such business. On the other hand, if goodwill depends on the continued presence of a particular individual, such goodwill, by definition, is not a marketable asset distinct from the individual. Any value which attaches to the entity solely as a result of personal goodwill represents nothing more than probably future earning capacity, which, although relevant in determining alimony, is not a proper consideration in dividing marital property in a dissolution proceeding.

*Id.* at 731, 386 N.W.2d at 858.

We believe the view expressed in *Taylor* is a sound one, and conclude that, for goodwill to be marital property, it must be a business asset with value independent of the presence or reputation of a particular individual—an asset which may be sold, transferred, conveyed or pledged. Thus, whether goodwill is marital property is a fact question and a party, to establish goodwill as marital property and divisible as such, must produce evidence establishing the salability or marketability of that

goodwill as a business asset of a professional practice.

We reverse and remand this cause regarding the trial court's erroneous rulings as to the appellee's bonus and valued interest in Orthopedic Associates. Because these property interests must be reconsidered by the chancellor, we are aware that any readjustment of these interests also might affect his earlier decision concerning the issue of alimony. Therefore, we remand with direction that the chancellor may consider the alimony issue along with the other two matters on remand.

HOLT, C.J., and NEWBERN, J., not participating.

HICKMAN and PURTLE, JJ., concur (*see Meinholz* v. *Meinholz*, 283 Ark. 509, 678 S.W.2d 348 (1984)).

Special Justice Charles Walker joins in the opinion.