Alonzo D. WILLIAMS *v.* Henrietta E. WILLIAMS

CA 02-453 108 S.W.3d 629

Court of Appeals of Arkansas
Division IV
Opinion delivered May 28, 2003

*Wilson, Engstrom, Corum & Coulter,* by: *Stephen Engstrom,* for appellant.

*Janice W. Vaughn,* for appellee.

JOHN MAUZY PITTMAN, Judge. This is a divorce case that involves the division of property, child support, mortgage payments, marital debts, and valuation of the husband's medical clinic and surgery center. For reversal, appellant contends that the trial court erred in setting child support at the level established by the family support chart and permitting the appellee to remain in the marital home and in requiring appellant to make the mortgage payments on the marital home in addition to child support and alimony. Appellant also contends that the trial court erred by failing to make an equal and equitable division of the marital assets. On cross-appeal, appellee asserts that the trial court erred in the valuation assigned to appellant's professional practices. We find no error, and we affirm in all respects.

Appellant Alonzo Williams is a gastroenterologist who owns a clinic, Arkansas Diagnostic Center, P.A. (ADC), and a surgery center, Gastroenterology Center of Arkansas, P.A. (Gastro), in Little Rock. He and appellee/cross-appellant Henrietta Williams were married in 1972 and had three children, two of whom were minors at the time of trial. Appellee, who has a Ph.D. in special education, began work in appellant's practices in 1984. By appellant's admission, appellee played a significant role in developing his practices, which are phenomenally successful. As hostilities between the parties escalated, appellant fired her; she was not working at the time of trial. The parties separated in 1997. During the marriage, appellant had extramarital affairs with other women and had two children born out of wedlock with two different women. Appellant's girlfriend is the mother of one of those children. For several years, appellant has provided substantial support to his girlfriend and their daughter. He managed to keep the amount of this support secret from appellee with the assistance of his accountant. Appellant also supports his other daughter born out of wedlock.

At trial, appellee requested child support in the amount set by the family support chart, possession of the marital home (11,200 square feet), an equal division of the property, and alimony. She also asked that appellant be required to make the mortgage payments on the house. Appellant asked the judge to award less than the amount of child support set by the chart; to force appellee and the children to vacate the marital home and move into a less expensive house; and to make an unequal division of the marital property in his favor. The parties disputed the proper valuation of appellant's clinic and surgery center; appellee argued that both practices had a substantial goodwill value, and appellant asserted that they did not. Both parties presented exhaustive evidence about their valuation.

The judge awarded appellant a divorce on the basis of eighteen months' separation. He found that appellant's net income for 1999 was $778,495, or $64,875 monthly, and set appellant's child-support obligation at $13,624 per month, in keeping with the support guidelines. He also awarded appellee monthly alimony of $4,000. The judge awarded possession of the house to appellee

and the children until the youngest child graduates from high school, when it will be sold and the net proceeds divided equally between the parties. He ordered appellant to make all repairs on the house exceeding $500.

The judge awarded appellee a one-half interest in the clinic and surgery center, which he valued at $695,500, which is substantially less than appellee argued they were worth. He found the value of the parties' other real property as follows: 8907 Kanis Road $4,850,000; 8908 Kanis Road $1,500,000; and 305 Freeway Medical Tower $170,000. He gave appellee a one-half interest in these pieces of property, along with several other parcels for which no value was given, directing the parties to reach an agreement as to their disposition within forty-five days. The judge equally divided their cash, retirement funds, stocks, bonds, investments, life insurance policies, accounts receivables, and interests in several closely held businesses. The judge permitted appellee to keep her jewelry, a mink coat, some paintings, and a 1994 Mercedes.

The judge found that, during the marriage, after the parties' separation, and after the entry of the temporary order, appellant spent marital funds totaling at least $801,457.59 on his girlfriend and on his sisters, and awarded appellee one-half of that amount. To compensate appellee, the judge awarded her the entire contents of the marital residence, the title to a lot in Hickory Hills (valued at $110,000), and twelve acres in West Helena, Arkansas (valued at $25,000).

The judge held appellant responsible for the following debts: $279,104 for furniture and decorative items purchased for the marital home; $143,530 for repayment of life insurance policy loans and $105,565 for premium loans incurred after entry of the temporary order; $900,000 in personal loans from Metropolitan Bank; $292,010 for a stockholder loan from ADC; and $47,000 for his girlfriend's Mercedes.

### Standard of Review

We review traditional equity cases *de novo* on the record and will not reverse a finding of fact by the trial judge unless it is clearly against the preponderance of the evidence.

*Hunt v. Hunt*, 341 Ark. 173, 15 S.W.3d 334 (2000). In reviewing the trial judge's findings, we give due deference to the judge's superior position to determine the credibility of the witnesses and the weight to be accorded to their testimony. *Id*.

### The Direct Appeal

Appellant makes two arguments in his first point on appeal: first, that the trial judge abused his discretion in *not* deviating from the child-support chart; and second, that the trial judge abused his discretion in failing to require appellee to move into a less expensive house. Appellant has not challenged the judge's determination of his income or his finding that appellant attempted to hide his income with the assistance of his accountant. Appellant argues that the "staggering" child-support award, in addition to the requirement that he pay the mortgage on the marital home for the next seven years, amounts to an abuse of discretion and argues that the parties' historical spending level for the children was substantially lower than the child-support award. According to appellant, the chart amount exceeds the children's actual needs. He states that, exclusive of housing, the historical monthly spending on the children was $3,671.71. Appellant also contends that the marital home is more luxurious than necessary to give the children a comfortable lifestyle and that appellee and the children should be required to move into a less expensive house. Appellant cites out-of-state cases, including a Kansas case, *In re Marriage of Patterson*, 22 Kan. App. 522, 528, 920 P.2d 450, 456 (1996), where the court stated: "[N]o child, no matter how wealthy the parents, needs to be provided more than three ponies." Appellant recognizes that no Arkansas case has considered the "Three Pony Rule" but points out that the family support guidelines provide that the court can grant more or less support if the evidence shows that the needs of the dependents require a level of support different from the amount set by the chart. In oral argument, appellant acknowledged that the support guidelines do not set a "cap" on the level of support to be provided by high-income payors but urged this court to impose such a cap in this case.

It is true that the trial judge may deviate from the chart amount if it exceeds or fails to meet the needs of the child.

*See Scroggins v. Scroggins*, 302 Ark. 362, 790 S.W.2d 157 (1990); *Guest v. San Pedro*, 70 Ark. App. 389, 19 S.W.3d 62 (2000). The amount of child support a trial judge awards, however, lies within his sound discretion and will not be disturbed on appeal absent an abuse of that discretion. *Office of Child Support Enforcement v. Pittman*, 70 Ark. App. 487, 20 S.W.3d 426 (2000). Arkansas Code Annotated section 9-12-312(a)(2) (Repl. 2002) provides that, in determining a reasonable amount of support, the judge shall refer to the most recent revision of the family support chart, and that it shall be a rebuttable presumption that the amount contained in the chart is the correct amount of child support to be awarded. The statute states that only upon a written finding or specific finding on the record that the application of the support chart would be unjust or inappropriate, as determined under established criteria set forth in the family support chart, shall the presumption be rebutted. Because the child-support guidelines are remedial in nature, they must be broadly construed so as to effectuate the purpose sought to be accomplished by their drafters. *Pannell v. Pannell*, 64 Ark. App. 262, 981 S.W.2d 531 (1998).

The version of the family support chart in effect when the decree was entered was found at *In Re: Administrative Order No. 10: Arkansas Child Support Guidelines*, 331 Ark. 581 (1998). In Section IIIb, it provides that when the payor's income exceeds that shown on the chart, support for two children should be set at twenty-one percent. In Section I, it states in part:

> It is a rebuttable presumption that the amount of child support calculated pursuant to the most recent revision of the Family Support Chart is the amount of child support to be awarded in any judicial proceeding for divorce, separation, paternity, or child support. The court may grant less or more support if the evidence shows that the needs of the dependents require a different level of support.
>
> It shall be sufficient in a particular case to rebut the presumption that the amount of child support calculated pursuant to the Family Support Chart is correct, if the court enters in the case a specific written finding within the Order that the amount so calculated, after consideration of all relevant factors, including the best interest of the child, is unjust or inappropriate. Findings that rebut the guidelines shall state the payor's income, recite the

amount of support required under the guidelines, recite whether or not the Court deviated from the Family Support Chart and include a justification of why the order varies from the guidelines as may be permitted under SECTION V. hereinafter.

In Section V, Administrative Order No. 10 sets forth the following factors to be considered when deviating from the amount set by the chart:

1. Food;
2. Shelter and utilities;
3. Clothing;
4. Medical expenses;
5. Educational expenses;
6. Dental expenses;
7. Child care;
8. Accustomed standard of living;
9. Recreation;
10. Insurance;
11. Transportation expenses; and
12. Other income or assets available to support the child from whatever source.

Additional factors include:

1. The procurement and/or maintenance of life insurance, health insurance, dental insurance for the children's benefit;

2. The provision or payment of necessary medical, dental, optical, psychological or counseling expenses of the children (e.g. orthopedic shoes, glasses, braces, etc.);

3. The creation or maintenance of a trust fund for the children;

4. The provision or payment of special education needs or expenses of the child;

5. The provision or payment of day care for a child;

6. The extraordinary time spent with the noncustodial parent, or shared or joint custody arrangements; and

7. The support required and given by a payor for dependent children, even in the absence of a court order.

In *Anderson v. Anderson*, 60 Ark. App. 221, 963 S.W.2d 604 (1998), we affirmed the chancellor's straightforward application of the percentage set by the support chart to the husband's monthly net income of $9,696.

In this case, the trial judge made the following findings regarding child support:

> Ark. Code Annot., Section 9-12-312(a)(2) requires the court to set child support based upon the most recent child support chart. It is a rebuttable presumption that the chart amount is the correct amount of child support, and this court must enter specific findings regarding its reasons for deviating from the chart. The court must first ascertain the net income of Dr. Alonzo Williams on an annual basis. The court heard testimony from Mr. Richard Schwartz and Ms. Cheryl Shuffield as to the income, expenses and ability to pay of Dr. Alonzo Williams. Previous to the filing of this divorce action, Dr. Williams has earned over $2,000,000.00 per year. Dr. Williams' income has dropped during this divorce proceeding. It was proven at trial that Dr. Williams incorrectly reported monies spent on [his girlfriend] and that other expenses were improperly deducted as business expenses. The tax returns of Arkansas Diagnostic Clinic and Gastroenterology Center of Arkansas were amended to exclude these expenses as allowable business deductions. However, no change was made to Dr. Williams' personal tax returns. Dr. Williams included personal American Express charges as deductions which should have been reflected as part of his income. The court is of the opinion that Dr. Williams' salary was, for purposes of trial, made to appear less than what his actual net monthly or yearly income is. The court relies on Plaintiff's Exhibit 40, which is the child support calculations for Dr. Alonzo D. Williams for the year 1999. The court finds that Dr. Williams' annual income for child support purposes is $778,495.00, with a net monthly income of $64,875.00.

> The court finds, by a preponderance of the evidence, that the Defendant has failed to establish a reason for this court to deviate from the current family support chart. The court determines that child support should be set at the rate of $13,624.00 per month for two children. The court determines 21% of the monthly net of $64,875.00 to be $13,624.00. The Court finds that the child support calculations made by Plaintiff's expert, Mr. Richard Schwartz, are correct as they represent Defendant's disposable income more accurately than the Defendant or Defendant's expert. Dr. Williams can afford to maintain his children in the style and manner to which they have become accustomed to living during the marriage of the parties.

■ The amount of "historical expenses" offered by appellant was demonstrated at trial to be inaccurate. The record shows that these figures were based on only a portion of the total amount spent during the parties' separation; they did not include the substantial amount that appellant directly spent on the children. Also, during the separation, appellant was able to buy his girlfriend an expensive house, a very expensive ring, a Mercedes, and furnishings for her new house. He also bought her older daughter a car. He purchased a Mercedes for one of his sisters and a Lexus for another. He bought and furnished an expensive house for himself. Appellee also presented evidence that, during this proceeding, appellant and his girlfriend traveled extensively. Given the evidence of appellant's affluence, exceptional generosity, and extravagant lifestyle, we cannot say that the trial judge abused his discretion in setting child support in accordance with the presumptive amount derived from the family support chart.

In his second point, appellant asserts that the judge abused his discretion in ordering him to pay the mortgage on the marital residence until the youngest child graduates from high school. According to appellant, the monthly child-support payments of $13,624, the mortgage payments of $13,977.94, and the payments of $2,000 in insurance and real estate taxes amount to over $29,000 in monthly support for the children. Appellant contends that an order directing a noncustodial parent to make house payments must be deemed a form of child support, especially when the duration of the obligation is tied to a child's graduation from school or attainment of a certain age. He states that adding the mortgage payment to the child-support payment required by the chart produces a windfall to appellee, because the children's need for shelter is already covered by the child-support amount set by the chart. In the alternative, appellant argues that the judge should have deviated from the chart amount on the basis that a substantial element of support for the children (housing) was provided through the mortgage payments. Appellant also argues that the judge's decision regarding the mortgage payments amounts to an improper deviation from the support chart without the required findings from the judge. Appellant further contends that the judge's decision in this regard is especially inequitable because

he did not permit appellant to receive credit for the post-divorce reduction in the principal debt.

Citing *Bramlett v. Bramlett*, 5 Ark. App. 217, 636 S.W.2d 294 (1982), appellant argues that this sort of obligation should not be imposed unless there are special circumstances showing that support payments are ineffective or inefficient in satisfying a party's obligations to children or a former spouse. We do not agree with appellant's reliance on *Bramlett v. Bramlett*. Although we did affirm the husband's obligation to make the mortgage payments in that case and noted that the chancellor had considered this obligation in setting child support, the amount of child support was not an issue on appeal.

Additionally, the child-support guidelines do not support appellant's position. Although a trial judge has the authority to include mortgage payments made for the benefit of the child in an award of child support, especially when the term of the obligation is tied to the child's reaching the age of majority or finishing high school, *see Keesee v. Keesee*, 48 Ark. App. 113, 891 S.W.2d 70 (1995), there is no requirement that a mortgage payment *must* take the place of a portion of the amount of child support set by the chart; such a decision is clearly within the trial judge's broad discretion. The trial judge has wide discretion in awarding either party the possession of the home, and the award of possession of the home is subject to such terms as the judge deems to be equitable and just. *Schumacher v. Schumacher*, 66 Ark. App. 9, 986 S.W.2d 883 (1999); *Hodges v. Hodges*, 27 Ark. App. 250, 770 S.W.2d 164 (1989). Additionally, it is acceptable to permit the parties to equally share the proceeds of sale after only one party has made the mortgage payments for a period of time. *Schumacher v. Schumacher, supra*. Given this authority, we cannot say that the chancellor abused his discretion in requiring appellant to make the mortgage payments on the family home until his youngest child finishes high school.

Appellant's third and fourth points involve related facts and will therefore be considered together. Appellant asserts in his third point that the net effect of the judge's attempt to equally divide the property and to assign over $2 million in debt to appellant was

to award appellee $2.4 million more of the marital estate than he awarded appellant. He contends that, even though the judge stated that he was dividing the marital property equally between the parties, he actually made an unequal division, which appellee did not request and for which the judge failed to give an explanation. Appellant argues in his fourth point that the judge erred in failing to equally divide the debts. He asserts that, because the judge failed to reduce the value of the assets by the liabilities specifically tied to them, the net effect was to award appellee an inflated value for her one-half portion of the marital estate. According to appellant, with the exception of the house payments and appellee's jewelry, virtually all of the $2.4 million disparity between the assets awarded to the parties is a consequence of the marital debt assigned only to appellant. Appellant contends that, even though the judge stated that he would not divide the property unequally, he did so surreptitiously by allocating the debt in this fashion.

Appellant offers the following chart[1] in support of his argument that appellee received sixty-seven percent, and not fifty percent, of the marital estate:

| | Total | Appellant | Appellee |
| --- | --- | --- | --- |
| Cash | 211,129 | 105,565 | 105,565 |
| Retirement Funds | 383,100 | 191,550 | 191,500 |
| Marketable Securities | 940,068 | 470,034 | 470,034 |
| Closely Held business Interest | 695,516 | 347,758 | 347,758 |
| Insurance Cash Value | 3,013,216 | 1,506,608 | 1,506,608 |
| Real Estate | 8,363,250 | 4,181,625 | 4,181,625 |
| Future Equity in Hickory Hills | | 200,890 | 200,890 |
| Receivables | 131,706 | 65,853 | 65,853 |
| Total Assets | 14,374,290 | 6,940,338 | 7,433,953 |
| Liabilities | 7,092,563 | (4,511,741) | (2,433,953) |
| Net Marital Estate | 7,281,727 | 2,428,597 | 4,853,130 |

The following items are the debts that appellant contends should have reduced the value of the assets that secured them:

---

[1] We note that some of the figures in appellant's chart have been miscalculated.

A. The $292,010 shareholder debt due ADC and included as a receivable in the practices' valuation. Appellant argues that this loan was taken out prior to the parties' separation and that appellee's expert witness, Richard Schwartz, recognized this fact and included it as a receivable in his ADC valuations. Appellant's expert, Cheryl Shuffield, did the same.

B. A $600,000 loan from Metropolitan Bank, secured by an office building at 8901 Kanis Road property, that was utilized to pay taxes and to improve the 8907 Kanis Road property, which were marital debts. He argues that loans taken out to benefit both of the parties are marital debts regardless of which party takes out the loan or whether both parties are aware of the loan. *See Hunt v. Hunt, supra.*

C. A $300,000 loan from Metropolitan Bank secured by certificates of deposit owned by ADC. Appellant states that this loan, which was incurred to pay the parties' joint tax obligations, is secured by certificates of deposit owned by ADC that are included in its valuation.

D. $528,199 in loans secured by life insurance policies. Appellant points out that the judge did not give a reason for the allocation of this debt and asserts that he must have done so because appellant failed to pay the premiums after the entry of the temporary order. He argues that it was unfair for the judge to penalize him in this fashion while letting appellee get away with failing to place appellant's name on the policies as the judge had previously ordered. He further argues that some of these loans were taken out before the temporary hearing and all of them were for the benefit of the parties and the marital estate.

 Citing Missouri and Tennessee cases, appellant asserts that when a debt is secured, its value must ordinarily be offset against the value of the underlying asset. In essence, appellant argues that, because Ark. Code Ann. § 9-12-315 (Repl. 2002) mandates that marital *property* be divided equally unless the court finds that such a division is inequitable, it also requires that the division of *debts* be treated the same way. We do not agree. Section 9-12-315 does not apply to the division of marital debts; hence, in Arkansas, there is no presumption that an equal division of debts must occur. *Ellis v. Ellis*, 75 Ark. App. 173, 57 S.W.3d 220 (2001). In *Ellis v. Ellis*, the trial judge divided the marital property equally and ordered the husband to pay seventy percent of the marital debts. We affirmed the judge's unequal division of

the marital debts due to the disparity between the parties' incomes and their relative abilities to pay the debts.

 Although the division of marital debt is not addressed in Ark. Code Ann. § 9-12-315 (Repl. 2002), the chancellor has authority to consider the allocation of debt in a divorce case. *Box v. Box*, 312 Ark. 550, 851 S.W.2d 437 (1993); *Anderson v. Anderson*, *supra*. In fact, we have stated that an allocation of the parties' debt is an essential item to be resolved in a divorce dispute, *Ellis v. Ellis*, *supra*, and that it must be considered in the context of the distribution of all of the parties' property. *Boxley v. Boxley*, 77 Ark. App. 136, 73 S.W.3d 19 (2002). A judge's decision to allocate debt to a particular party or in a particular manner is a question of fact and will not be reversed on appeal unless clearly erroneous. *Ellis v. Ellis*, *supra*; *Anderson v. Anderson*, *supra*. It is not error to determine that debts should be allocated between the parties in a divorce case on the basis of their relative ability to pay. *Ellis v. Ellis*, *supra*; *Anderson v. Anderson*, *supra*. Furthermore, the effect of an allocation of debt on a spouse's lifestyle is a valid consideration; the supreme court has affirmed unequal debt allocations where a husband was able to pay the debts from income without materially changing his style of life but the wife could not pay the debts from her income without disposing of assets to pay part of the debt. *Richardson v. Richardson*, 280 Ark. 498, 503, 659 S.W.2d 510, 513 (1983). When considering the allocation of debts, it is also appropriate that the judge consider who should equitably be required to pay them. *Keathley v. Keathley*, 76 Ark. App. 150, 61 S.W.3d 219 (2001).

Appellant argues that this case is controlled by *Hoover v. Hoover*, 70 Ark. App. 215, 16 S.W.3d 560 (2000), wherein this court held that the chancellor had erred in failing to consider a large debt as part of his mathematical calculations while dividing the marital property. This court subtracted the amount of debt assigned to the husband from the value of the assets awarded to him in determining the total value of the property awarded to him in the divorce, stating:

In his letter ruling, the chancellor set out an item-by-item recitation of the marital assets and debts assigned to each party.

Appellee was awarded, free of debt, the couple's marital home, two vehicles, and other items with a total value of $917,406. Appellant was awarded the assets of Hoover Oil & Gas, valued at $421,642, an additional $210,821 enhancement to the company's value, the remainder of the couple's real property, and various other items with a total value of $1,319,514. Appellant was also assigned over $700,000 in debt, which included the $371,093 remaining mortgage on the marital home. His net award was therefor $618,998, or approximately forty percent of the marital property.

. . . . However, one significant item that was mentioned in the decree was not mentioned in the letter ruling — the $156,106 debt owed by Hoover Oil & Gas to First National Bank. In the decree, the debt is assigned to appellant. However, it is not included in the mathematical calculations in the letter ruling.

Appellant argues that the chancellor, in his letter ruling, obviously intended to divide the property 60/40 between the parties, but, due to several errors, the actual division was much more unequal. In particular, he contends that the assets assigned to him are much less valuable than they appear because the chancellor failed to reduce the worth of Hoover Oil & Gas by the $156,106 debt owed to First National Bank and because the chancellor arbitrarily added a 50% enhancement ($210,821) to the value of Hoover Oil & Gas. We agree that the chancellor erred on both counts.

70 Ark. App. at 218-19, 16 S.W.3d at 562.

We do not agree that *Hoover* is controlling. A close reading of *Hoover* shows that we based our reversal not on the percentage distributed to each party but instead on the erroneous calculation of the value of an asset assigned to the appellant. Therefore, *Hoover* does not stand for the proposition that the marital debt must be subtracted from the marital assets to determine the "net" value of the total award made to each party in all divorce cases. Although the chancellor in *Hoover* used this method, and we followed his methodology, the methodology itself was not in issue. Accordingly, we hold that the assignment of these *debts* to appellant did not constitute an unequal distribution of the marital *property*.

The trial judge explained his decision to assign these debts to appellant as follows:

During the course of the marriage, after the separation of the parties, and after entry of the restraining order in this matter, Dr. Williams spent considerable monies on the mother of one of his illegitimate children, . . . and in purchasing new automobiles for his sisters. The evidence reveals that Dr. Williams spent in excess of $801,000.00 on [his girlfriend] and his sisters. The funds expended were marital funds.

. . . .

Prior to the separation of the parties, certain loans on insurance policies were made by Mrs. Williams to pay for furniture and decorative items for the parties' home. The total for these loans is $279,104.00. Dr. Williams will be responsible for the repayment of these loans. Further Dr. Williams was required, pursuant to the parties' Agreed Temporary Order, to pay insurance premiums on the policies. Dr. Williams will be solely responsible for reimbursing the marital estate for all premium loans incurred after the date of the temporary order of February 27, 1998. This amount totals $105,565.00. Dr. Williams will be solely responsible for the insurance policy loan in the amount of $143,530.00 taken on policy No. 10-031-697 after the date of the separation and temporary order. Dr. Williams will also be solely responsible for the loan on [his girlfriend's] automobile in the amount of $47,000.00, for the personal loans from Metropolitan Bank in the amount of $900,000.00, for the stockholder loan from ADC in the amount of $292,010.00.

The court will award as Mrs. Williams' separate property, the entire contents of the parties' marital residence as partial reimbursement and compensation by Dr. Williams for the monies expended for [his girlfriend] and Dr. Williams' sisters after separation and after the restraining order was entered in this matter. The court finds that the award to Mrs. Williams of these items of personal property, as well as the title to Lot 29, Hickory Hills and the twelve acres in West Helena, Arkansas, as her separate property, will compensate her for the funds expended by Dr. Williams.

All other retirement accounts, cash and cash equivalent accounts, marketable securities, insurance policies and accounts receivable of the parties shall be divided in kind. All real property owned by the parties upon the entry of a decree of divorce shall be converted to ownership as tenants in common.

Dr. Williams has requested that the Court make an unequal division of marital property pursuant to Ark. Code Annot., Sec-

tion 9-12-315(a)(1)(A)(v) and (vii). The court finds absolutely no merit to Dr. Williams' contention that the marital estate should be divided unequally in his favor. In fact, had the Plaintiff requested an unequal division of marital assets, the court would have been much more inclined to make an unequal division in favor of Mrs. Williams than Dr. Williams. Dr. Williams expenditures for illegitimate children and paramours, his attempts to hide assets through accounts with Mr. Kramer, and other activities which the court views as an attempt to minimize income and place assets beyond the reach of Mrs. Williams, further justify the court refusing to divide the marital property unequally in Dr. Williams' favor.

The parties to a divorce often must use marital funds to meet necessary expenses incurred during the pendency of an action, and the chancellor has discretion to determine whether it was necessary to use those funds, whether the amount used was reasonable, whether fraud or overreaching occurred, and whether an offset is appropriate. *Burns v. Burns*, 312 Ark. 61, 847 S.W.2d 23 (1993). The trial judge's findings as to the circumstances warranting a property division will not be reversed unless they are clearly erroneous. *Dennis v. Dennis*, 70 Ark. App. 13, 13 S.W.3d 909 (2000); *Smith v. Smith*, 32 Ark. App. 175, 798 S.W.2d 442 (1990).

Arkansas Code Annotated section 9-12-315(a)(1) (Repl. 2002) provides that all marital property shall be distributed one-half to each party unless the court finds such a division to be inequitable; in that event, the court shall make some other division that the court deems equitable, taking into consideration the following factors: (1) length of the marriage; (2) age, health, and station in life of the parties; (3) occupation of the parties; (4) amount and sources of income; (5) vocational skills; (6) employability; (7) estate, liabilities, and needs of each party and opportunity of each for further acquisition of capital assets and income; (8) contribution of each party in acquisition, preservation, or appreciation of marital property, including services as a homemaker; and (9) the federal income tax consequences of the court's division of property. The statute further states that, when property is divided pursuant to these considerations, the court must state in the order its reasons for not dividing the marital property equally.

Arkansas Code Annotated section 9-12-315, however, does not compel mathematical precision in the distribution of property; it simply requires that marital property be distributed equitably. *Creson v. Creson*, 53 Ark. App. 41, 917 S.W.2d 553 (1996). The statute vests the chancellor with a measure of flexibility and broad powers in apportioning property, nonmarital as well as marital, in order to achieve an equitable distribution; the critical inquiry is how the total assets are divided. *Id. Accord Box v. Box, supra; Boxley v. Boxley, supra.* This court will not substitute its judgment on appeal as to the exact interest each party should have but will only decide whether the order is clearly wrong. *Boxley v. Boxley, supra.* On our review of the extensive record in this case, we cannot say that the trial court's order is clearly wrong.

## Cross-Appeal

Appellee has filed a cross-appeal from the judge's valuation of appellant's clinic and surgery center. She contends that the judge failed to follow Ark. Code Ann. § 9-12-315(4) (Repl. 2002), which provides that, when stocks or other securities issued by a corporation make up part of the marital property, the court shall, if awarding the securities to only one party, determine the fair market value of the stock and then award the other spouse an amount in money or other marital property equal to the fair market value of the securities.

The judge made these findings of fact regarding the valuation of appellant's practices:

> Plaintiff contends that the combined value of the professional practices is $2,388,200.00 based upon the business appraisal of Mr. Richard Schwartz. Defendant contends that the value of the professional practices is $465,500.00 based upon the appraisal of Ms. Cheryl Shuffield. The differences in the value per the appraisal of the two competing expert witnesses is $1,922,700.00.
>
> Mr. Schwartz testified that the fair market value of the two corporations included the fair market value of the intangible assets of the corporation, including the business or practice goodwill as well as fair market value of the tangible assets belonging to the practices. Mr. Schwartz contended that the goodwill to which he was referring was "practice" or "business" goodwill rather than "personal" goodwill and that this practice goodwill

was of the type that could be transferred and sold along with the corporate assets. He further testified that this goodwill was not dependent upon Dr. Williams' continued presence. Mr. Schwartz distinguished this practice goodwill for the personal goodwill that Dr. Williams has by virtue of Dr. Williams' compensation received in the form of salary.

Part of the differences in the valuation of the practices is attributable to the expert real estate appraisers upon whom Mr. Schwarz and Ms. Shuffield relied in formulating their values for the practices. Mr. Schwartz relied upon a valuation of $1,550.00.00 by Mr. Tom Ferstl for the office building located at 8901 Kanis Road, Little Rock. Ms. Shuffield relied upon the appraisal of Mr. R.M.S. Pearce valuing the property at 8901 Kanis Road at $1,320,000.00, a difference of some $230,000.00. The bulk of the difference in value as between Mr. Schwartz and Ms. Shuffield was that which was attributable to the goodwill of the business. Ms. Shuffield testified that any goodwill of the corporations would be "personal" goodwill and thus she rejected the market approach to valuation as well as the income approach. She instead valued the business purely from an adjusted asset approach. Mr. Schwartz' net asset method and his income method relied heavily on calculations of considerable goodwill. Mr. Schwartz' valuations failed to distinguish between personal and professional goodwill associated with the two professional corporations.

Under prevailing case law, for goodwill to be marital property, it must be a business asset with value independent of the presence or reputation of a particular individual. *Tortorich v. Tortorich*, 50 Ark. App.114, 902 S.W.2d 247, 250 (1955) [sic] (citing *Wilson v. Wilson*, 294 Ark. 194, 205-06, 741 S.W.2d 640, 647 (1987)). To establish goodwill as marital property and thus be divisible, the party must produce evidence establishing the salability or marketability of that goodwill as a business asset of a professional practice. The *Tortorich* and *Wilson* cases confirm that the burden is on the party who seeks to establish goodwill as a marital asset to produce convincing proof delineating between professional goodwill on the one hand and personal goodwill on the other. *Wilson*, 294 Ark. App. 121, 741 S.W.2d. 640. Mr. Schwartz admitted in his testimony that he did not attribute any value to Dr. Alonzo Williams' personal reputation. He stated that he ". . .didn't distinguish between the goodwill that developed between any personal and any professional."

At trial, Defendant testified that he was raised in West Helena and how he gained recognition for his personal, professional and civic achievements. Defendant serves [sic] on the Arkansas State Medical Board for the past twelve years and has held the position of secretary for approximately six years. Dr. Williams also has served on the board of the Boy Scouts in this area counsel for many years.

Dr. Williams attributes his draw of patients to various factors. Specifically, he testified that he has a group of twenty to thirty physicians with whom he maintains regular contact and from whom he receives referrals. Dr. Williams contends that he receives much of his business based upon referrals. He testified that these referrals keep coming because the referring doctors are his personal friends and know that he will treat the patient well regardless of financial circumstances. Dr. Alonzo Williams testified that the racial makeup of his patient base is over 80% African-American. Dr. Williams is one of the only two African-American board certified gastroenterologists in Arkansas. The burden of proof is with the Plaintiff, not the Defendant, to delineate the facets of goodwill. The court finds that the Plaintiff has failed to do so.

The court finds that Mr. Schwartz' market valuation method was unconvincing due to lack of comparable features in the transaction upon which he relied. For example, in his valuation of Gastro, Mr. Schwartz could reference only two transactions or sales; neither of these two transactions were in Arkansas. One transaction was in Kansas City and one was in Naples, Florida. One transaction or sale was in 1997. Mr. Schwartz did not know the number of physicians involved in the practices which were the subject of the transactions; he did not know whether there were non-compete agreements signed; he did not know whether the motivation for these particular transactions were strategic; he did not know whether the transaction was in stock or for cash; he did not know how the liabilities were handled in the transaction; he did not know whether the acquiring entity bought 100% or only a portion of the Kansas City business; and he acknowledged that the Florida transaction was for only 60% of the business.

The transactions relied upon by Mr. Schwartz regarding ADC were more numerous but lacking in comparable detail, most notably they were quite remote. Almost all of the transactions dated back to 1996. The court notes that there has been

considerable volatility and change in the health care industry in the last few years. Acquisitions have diminished and motivations have changed.

The court adopts the valuation placed on Gastro and ADC by Ms. Shuffield, with the exception of her reliance upon the appraisal of Mr. Pearce. The court places the greater credibility and weight on the testimony of Mr. Tom Ferstl, the appraiser upon which Mr. Schwartz relied in valuing the practices. Therefore, the valuation placed upon the practices by Ms. Shuffield totaling $465,500.00 will be increased by the sum of $230,00.00, the difference between the appraisal of Mr. Ferstl and Mr. Pearce, resulting in a valuation of $695,500.00 for ADC and Gastro.

Ms. Shuffield's values were based upon the adjusted book value, or net asset value method, which is a cost approach. The underlying theory of the cost approach is that a buyer will not pay more for an asset than the cost to reproduce such asset (whether tangible or intangible). The standard of value applied was fair market value, going concern basis. In arriving at value, it was necessary to distinguish the value of any personal goodwill, which pursuant to Arkansas case law, is not a marital asset. An individuals' probable future earnings capacity is non-marital property. For goodwill to be marital property, it must be a business asset with value independent of the presence or reputation of a particular individual. Ms. Shuffield's analysis focused on transferable value, absent Dr. Alonzo Williams' continued physical presence in the business.

Dr. Alonzo Williams' continued presence is of particular significance in the valuation of Gastro where Dr. Williams personally performed procedures accounting for 84% of the revenues in 1998, and 89% in 1999. The court notes that a buyer of 100% interest in Gastro could not legally protect himself against the eventuality that Dr. Alonzo Williams might choose to perform those procedures elsewhere, or that Dr. Alonzo Williams might retire, or be disabled. The proof reflected that without Dr. Alonzo Williams' continued use of and presence at Gastro, Gastro would operate at a loss. The only way for Dr. Williams to realize full value of the income generated by Gastro would be for him to remain in place as its owner. For this reason, the market approach was rejected by Ms. Shuffield in the Gastro valuation and Court views this as reasonable. This same reasoning lead Ms. Shuffield to reject the income approach. If a buyer can not protect himself against loss of the income stream, then the income approach is inapplicable.

Ms. Shuffield rejected the market approach in the valuation of ADC for the following reasons:

(a). Market data does not provide sufficient data to distinguish between personal and enterprise, or professional, goodwill.

(b). Market data does not provide sufficient information for comparability of consideration.

(c). Market data does not provide sufficient information for comparability of the subject with reported transactions due to geographical differences, differences in patient population and characteristics, differences in managed care environments, number of physicians, and distribution of patient base among physicians.

(d). Market comparables were unavailable for any transactions occurring after 1997.

Ms. Shuffield properly rejected the income approach in valuing ADC because:

(a). Any income model based on historical results of operations would necessarily include an employment contract with Dr. Alonzo Williams to attain comparable results on a perspective [sic] basis.

(b). An income model constructed without the assumed continued presence of Dr. Alonzo Williams must take into account not only the continued patronage of the patient population absent his presence, but also the cost to reproduce his services.

(c). Absent even these considerations, if one takes into account the expected decreases in revenues from HCFA (for which Ms. Shuffield introduced supporting information) and other third party payors, there are no excess earnings to capitalize; thus the adjusted book value approach utilizing a cost to reproduce the enterprise value yields the higher value than one which utilizes earnings capacity.

Ms. Shuffield testified that the value of Arkansas Diagnostic Center, P.A., prior to application of a marketability discount was comprised of net tangible operating assets of $570,418.00, enterprise goodwill value of $75,000.00, and a deficit value per net non-operating assets of ($202,083.00), for a total asset value, net of liabilities, of $443,335.00. A marketability discount of

$36,570.00 was deducted to arrive at a total concluded value of $407,000.00 for the 100% ownership interest in ADC. The marketability discount was calculated at 10% and excluded the values of non-operating assets and also the face amount of stock holder receivables. Had the conclusion of value been reached through a market or income approach, a considerably higher marketability discount percentage would have been applied.

As previously stated $230,000.00 of the difference between Ms. Shuffield's and Mr. Schwartz' concluded value of ADC is attributable to the differing real estate values for the property at 8901 Kanis. The court finds that the value placed on the property at 8901 Kanis by Mr. Tom Ferstl is the more reliable and creditable value and therefore will increase the value of the ADC practice by the $230,000 difference between Mr. Ferstl and Mr. Pearce's appraisals. . . .

As mentioned above, Ark. Code Ann. § 9-12-315 (Repl. 2002) requires the use of the "fair market value" standard for valuing businesses in a marital property context. *See Cole v. Cole*, 82 Ark. App. 47, 110 S.W.3d 310 (2003). We will reverse the trial court's finding of the valuation of a business only if it is clearly erroneous. *Miller v. Miller*, 70 Ark. App. 64, 14 S.W.3d 903 (2000); *Vestal v. Vestal*, 28 Ark. App. 206, 771 S.W.2d 800 (1989). Difficulty arises in valuing a professional practice when goodwill is likely to depend on the professional reputation and continuing presence of a particular individual in that practice. For goodwill to be marital property, it must be a business asset with value independent of the presence or reputation of a particular individual — an asset that may be sold, transferred, conveyed or pledged. *Wilson v. Wilson*, 294 Ark. 194, 741 S.W.2d 640 (1987). Thus, whether goodwill is marital property is a fact question, and a party, to establish goodwill as marital property and divisible as such, must produce evidence establishing the salability or marketability of that goodwill as a business asset of a professional practice. *Id.*

In *Tortorich v. Tortorich*, 50 Ark. App. 114, 902 S.W.2d 247 (1995), we held that the husband's business goodwill in a solo oral surgery practice was not marital property:

> While we agree with the chancellor's finding that Mr. Schwartz's testimony was persuasive to an extent, we fail to find any evidence that Dr. Tortorich's professional association had "value independent of the presence or reputation of [this] partic-

ular individual — an asset which may be sold, transferred, conveyed, or pledged."

Dr. Tortorich is a sole practitioner whose personal skills developed his reputation with other dentists. Dr. Tortorich's practice, as the evidence clearly showed, was almost wholly dependent on referrals from other dentists who referred patients to him based on his reputation alone. Without the presence or reputation of this particular individual the oral surgery practice had no value independent of its tangible assets. The chancellor adopted Mr. Schwartz's opinion of the goodwill value of Anthony L. Tortorich, D.D.S., P.A., and held that this goodwill had a value of approximately $180,000 and was a marital asset. It appears that Mr. Schwartz arrived at his opinion by capitalizing the above average net income Dr. Tortorich has been able to generate in his practice. This does not, however, purport to distinguish the superior personal earnings capacity of Dr. Tortorich from any goodwill of the professional association independent of his continued presence and reputation. Upon our de novo review we conclude that the value of Dr. Tortorich's P.A. is $61,086 and that it has no goodwill value independent of Dr. Tortorich's presence and reputation. We do not hold, as suggested in the dissenting opinion, that a solo professional practice can never have business goodwill independent of the personal goodwill of the practitioner. We simply hold that pursuant to *Wilson*, Mrs. Tortorich had the burden of proving that Dr. Tortorich's professional association had business goodwill independent of Dr. Tortorich's personal goodwill if it was to be considered a marital asset. This she failed to do. The chancellor's finding to the contrary was clearly erroneous and is reversed.

50 Ark. App. at 120-21, 902 S.W.2d at 251.

Appellee's expert, Richard Schwartz, testified that the fair market value of ADC is $911,200 and that the fair market value of Gastro is $1,477,000. Mr. Schwartz testified that appellant was compensated for his personal goodwill in the form of his salary. Appellant's expert, Ms. Shuffield, valued ADC at $407,000 and Gastro at $58,000; she assigned "some" enterprise value but stated that any goodwill of the corporations would be personal goodwill.

Appellee argues that Ms. Shuffield's valuation of the practices was unreliable. She contends that most of the business at ADC and Gastro consists of repeat visits from patients, which comprise a continuing patient base, and not new referrals. She also directs

this court's attention to the testimony of Bill Kremer, appellant's accountant, who had valued the practices significantly higher in 1994 when the parties contemplated selling them to appellant's nephew. Appellee also points out that appellant testified that he had hired other doctors to take over his hospital work so that he could concentrate on doing procedures at Gastro; that both practices are not named after appellant; and that, even though appellant owns the practices, two other doctors also work there.

We think that the trial judge's extensive findings concerning the unreliability of Mr. Schwartz's valuation are supported by the evidence and that the judge's adoption of the valuation offered by appellant's expert, Ms. Shuffield, is not clearly erroneous. The goodwill factor was the major point on which the experts disagreed. The evidence at trial, however, preponderates in favor of a finding that most of the goodwill attributable to appellant's practices depends on his professional reputation and his continuing presence and that appellee failed to satisfy her burden of proving otherwise. Appellant presented evidence that most of his practice is dependent upon referrals from other physicians and not repeat business; that his efforts to provide attentive service to his patients have been successful; that he works hard and efficiently; that his reputation in the Little Rock area and in eastern Arkansas, where he grew up, is excellent; that he is very involved in community affairs; and that he was, at the time of trial, the secretary of the Arkansas Medical Board. Although two other physicians are employed by appellant's practices, appellant brought in eighty-four percent of Gastro's revenues in 1998 and performed three times as many procedures as the other physicians. Appellant saw over fifty percent of ADC's patients. Furthermore, appellee's expert failed to adequately account for the reduction in patient revenues that would be associated with appellant's departure from the practices. For these reasons, and because appellant's expert, Ms. Shuffield, did in fact include enterprise value in her valuation of the practices, we cannot say that the trial judge erred in crediting her valuation over that of Mr. Schwartz.

Affirmed on appeal; affirmed on cross-appeal.

STROUD, C.J., and BAKER, J., agree.